**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| **BIANCA BEST,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Case No. 2:25-cv-13514-RMG-MGB |
| | ) | |
| **SAM RICHARDSON, Sheriff of Dorchester** | ) | |
| **County, in his individual and official capacity,** | ) | **COMPLAINT** |
| **CLAYTON KILLION and MARC** | ) | **(Jury Trial Demanded)** |
| **MOOD, Deputies with the Dorchester** | ) | |
| **County Sheriff's Office, in their** | ) | |
| **individual and official capacities,** | ) | |
| **DORCHESTER COUNTY SHERIFF'S** | ) | |
| **OFFICE, COUNTY OF DORCHESTER** | ) | |

**<u>INTRODUCTION</u>**

1. This case involves the intentional use of violent force and restraint by deputies of the Dorchester County Sheriff's Office, acting under color of law, against an innocent female citizen who they did not suspect of being involved in criminal activity, posing an imminent harm to the deputies or to herself, or posing a risk to the preservation of evidence relating to any suspected crime.

2. The officers had been called because the citizen was suffering from a psychological and emotional episode. Although she had expressed suicidal ideations, the woman was not engaging in harmful behavior, nor was she threatening to engage in any assaultive behavior. She was naked and sitting in her bathtub when accosted by the deputies.

3. The deputies had been invited into the home by the woman's husband, had no reason to suspect her of a crime, and did not fear for their own safety. When accosted by the deputies, the woman expressed umbrage and disbelief that law enforcement agents would

come into her home and intrude into her solitude while she was in a state of undress. The deputies responded by violently battering the woman, placing her in handcuffs, dragging her out of her bathroom with such force that she fell down the stairs, landing handcuffed, injured, and naked on the floor. Rather than cover her with a sheet or blanket to preserve her dignity, the deputies then picked her up and dragged her naked and handcuffed through her front yard in full view of her neighbors, thereby causing her physical injuries, mental anguish, fear, and deep humiliation.

4. Through this complaint, the woman seeks redress of these grievances committed against her by uniformed officers of her local sheriff's department acting under color of law.

## PARTIES, JURISDICTION, AND VENUE

5. The Plaintiff is Bianca Best, a resident of Michigan, was at the time of the events a resident of Dorchester County, South Carolina.

6. Defendant Sam Richardson is the sheriff of Dorchester County.

7. Defendant Clayton Killion is a deputy in the Dorchester County Sheriff's Office.

8. Defendant Marc Mood is a deputy in the Dorchester County Sheriff's Office.

9. Defendant Dorchester County Sheriff's Office is a sheriff's department responsible for law enforcement duties in Dorchester County, South Carolina.

10. Defendant County of Dorchester is the government entity under which the Dorchester County Sheriff's Office is organized.

11. Federal jurisdiction is proper in this case because federal claims are raised.

12. The acts and omissions complained of herein occurred in Dorchester County, South Carolina, making venue proper in this district.

## FACTS

13. On or about May 19, 2025, Defendants Clayton Killion and Marc Mood, deputies with the Dorchester County Sheriff's Office responded to a call at the Summerville, South Carolina, home of Plaintiff Bianca Best.

14. The call was generated by a report of a domestic disturbance and when Deputy Killion arrived on the scene, he spoke with Tracey Best, husband of the Plaintiff, who stated that he had gotten into an argument with his wife, the Plaintiff, and that she had threatened to commit suicide.

15. Mr. Best informed Deputy Killion that officers had been dispatched to the home the previous day for a similar reason, and further stated that the Plaintiff was "undressed and screaming at him."

16. Deputy Killion reported that, "I spoke to Bianca (the Plaintiff) who stated in an excited utterance, "Leave me alone I am waiting for the pills I took to kick in so I can die." Killion reported that the Plaintiff stated several times that she wished to end her life after an argument she had engaged in with her husband.

17. Deputy Killion's original report denied that he observed any physical or non-physical injuries and denied that the subject was under the influence of alcohol or drugs.

18. Deputy Killion stated that he asked the Plaintiff if she could put some clothes on, and in response she exited her bedroom and approached him in the hallway undressed and stated, "You are going to arrest me in my own house."

19. The Plaintiff, a petite female who immigrated to the United States from Zimbabwe, expressed her discomfort with Killion barging in on her privacy, accosting and pressuring her and raising his voice as she simply sat lawfully and peacefully in her own bathtub,

naked and reeling with discomfort at the sight of a male stranger coming into her home and taking such an aggressive approach with her in such a private space.

20. Killion stated that he advised the Plaintiff that "she needs medical help due to her suicidal statements," and that she "belligerently refused and proceeded to walk away from [him]," attempting to re-enter the bedroom from which she had come.  Killion stated that when he advised the Plaintiff to wait, she refused to do so.  Killion then stated, "I attempted to detain Bianca so she could prevent further harm to herself, to which she resisted."  He further stated, "Bianca resisted in the bath rub, to which there was a razor next to her on the tub."

21. The razor was a disposable shaving stick that the Plaintiff kept on the edge of the tub to shave her legs while she was bathing and it posed no threat to Killian or the Plaintiff, and Killion well knew that.

22. Despite Killion's later claims that force was necessary to separate the Plaintiff from the tub, due to the presence of a razor, he made no immediate attempt to either remove the Plaintiff from the environment he later characterized as posing an imminent danger (due to the presence of the razor), and no immediate attempt to remove the razor from the tub, which would have rendered the environment safe from any danger.

23. Rather, Killion allowed the Plaintiff to remain in the tub next to the razor until a short time later, when Deputy Marc Mood arrived.  Upon Deputy Mood's arrival, the deputies chose to use force against the Plaintiff, placing her in handcuffs and forcefully and violently dragging her out of her home and through her front yard naked to hand her over to EMS.

24. When deputies chose to use overwhelming and excessive physical force to restrain and then remove the Plaintiff, they did not reasonably believe that the Plaintiff posed any plausible imminent harm to herself or to anyone else. Although Deputy Killion later cited the presence of the razor, he did not report any contemporaneous fear of the Plaintiff using the razor as a weapon to harm him or herself, as evidenced by the fact that he chose not to attempt to remove her from the razor and chose not to remove the razor from her proximity.

25. Although the deputies appear to characterize their actions as justified efforts to prevent imminent self-harm, there is no indication that the Plaintiff had the intention or means to inflict any such harm. If Deputy Killion had believed that the razor he describes posed an imminent threat, he would have taken necessary action to separate the Plaintiff from its presence. However, he took no such action but instead, according to Deputy Mood's later report, was talking to the Plaintiff "in a loud manner."

26. Deputy Mood stated that he followed the loud voices to the bathroom, where he observed the Plaintiff sitting in the bathtub with no shirt on. Deputy Mood then reported that he proceeded to have a discussion with Deputy Killion (who says that he was then aware of the presence of the razor but had apparently paid it no mind) in which Deputy Killion told Deputy Mood that the Plaintiff had taken some pills and reported suicidal ideations. Upon information and belief, Deputy Killion thought so little of the presence of the razor that he did not tell Deputy Mood about its presence or express any concern about its location. This is evident from Deputy Moody's report, which stated that he learned of the razor's presence when he independently observed it while the officers were standing there waiting for EMS to arrive.

27. Both Deputy Killion and Deputy Mood were aware that they were dealing with a subject who was experiencing a psychiatric emergency, but they also both knew that the source of possible harm were the pills which they knew that the Plaintiff had already ingested.

28. Deputy Killion, in his report, stated that he later took a photo of a half-empty bottle of pills that were the same type of pills that he believed that the Plaintiff had taken, but the pills were not located within the Plaintiff's reach and were not found until after she had been transported by EMS. As such, they did not and could not have formed the basis for any concern that absent the use of overwhelming and excessive force, the Plaintiff was in danger of grabbing the pill bottle and ingesting more of the pills.

29. The only emergency that the deputies knew or suspected to exist was the danger that the pills the Plaintiff had taken might kick in and cause her to begin suffering physical distress or loss of consciousness. However, the deputies did not even know what type of pills the Plaintiff had allegedly taken and observed no rapid or gradual deterioration in her faculties that would indicate onsetting harm from the pills (whatever they might have been) taking effect.

30. Rather, the deputies reports indicate that the Plaintiff was awake and alert, making no threats of violence and engaging in no violent or threatening behavior that would have warranted the use of force, much less the extreme use of force that they chose to apply. In fact, the deputies' reports make it clear that the Plaintiff was very much awake and alert, and that she was simply and justifiably upset that she was being aggressively and loudly accosted by officers in her own home while she was committing no crime, posing no threat of violence, and simply going about her business. Her justified anger at their aggression was compounded by the fact that they were accosting her as she lawfully and

peacefully sat naked in her own bathtub.  The fact that she was unclothed was further evidence, plain to the deputies observing her, that there was no danger of her retrieving pills or a weapon secreted in the pocket of her clothes or hidden behind any obscuring force or object.

31. The Plaintiff's alleged "belligerence" was nothing more than understandable and justifiable umbrage at being accosted, shouted at, and grabbed as she sat naked in her bathtub in her own home while posing no threat to anyone.

32. Although the deputies knew that the Plaintiff was suffering from a psychiatric event, they made no attempt to calm or deescalate the situation but rather treated the Plaintiff as if she was a violent criminal who posed an immediate threat of harm and who was violently resisting arrest.  As the deputies' reports make clear, there was no arrest because there was no suspicion, reasonable or otherwise, that any crime had been committed or was in danger of being committed.

33. In the light most favorable to the deputies, the most that could be said is that the Plaintiff required medical assistance to be transported to the hospital for observation.  Any reasonable law enforcement officer, possessing the knowledge possessed by the deputies, would have known that it would have been grossly unreasonable to take any form of action other than attempting to calm the Plaintiff, deescalate the situation, cover the Plaintiff with a blanket, and in a dignified manner assist her in walking to the ambulance.

34. However, the deputies chose a completely unreasonable, unlawful, unconstitutional alternative that evinced malice, spite, vindictiveness, and cruelty.  They chose to use force against the Plaintiff's body by physically grabbing her, placing her in handcuffs (despite

the absence of possibility or threat of her harming herself or them), roughly dragging her out of her home with such force that she fell down the stairs of her home.

35. When the deputies picked her up off the floor at the bottom of the stairs, they did not attempt to gently calm her and, despite having ample time and opportunity, did not attempt to cover her nakedness. Rather, they once again used unjustified and excessive force to further drag her naked through her front yard in full view of her neighbors. Upon information and belief, they did so to punish, retaliate against, and humiliate her for having expressed umbrage at their outrageous behavior toward her since their arrival to her home.

36. It is important to note that the deputies were not there to serve a warrant, had no reason to suspect the presence of any violent or illegal activity, had no reason to believe that they or the Plaintiff were in any plausible imminent danger, and had been granted access to the home by the consent of the Plaintiff's husband, who had welcomed them in and fully briefed them on what was happening—which was nothing more than the Plaintiff having a psychological emergency.

37. Further, the deputies were on even greater notice that what they were encountering was a psychological emergency with no accompanying threat of physical harm because they were informed, at the point of entry, that officers had been called to the home the previous day for a similar event.

38. Even more, upon information and belief, the deputies were very familiar with both the nature of the emergency and the situation's absence of harm because they had been called dozens of times from that location with similar reports, and none of those calls had revealed any evidence that the Plaintiff, who on information and belief was known to the

deputies and their supervisors, posed any physical threat to anyone, and they did not, and could not, reasonably believe that the Plaintiff was involved in any past or present criminal activity. As such, the deputies had a heightened standard of care and reasonableness but chose to act in a cruel, vindictive, punitive, violent, and excessive manner not out of any justifiable fear of harm or belief that such force was necessary to stop the commission of a crime, but simply to punish a person they knew suffered from serious and chronic psychological distress for the "crime" of causing them to repeatedly receive distress calls from that address.

39. In short, the officers were presented with a situation where entry was by consent and where no facts, known, unknown, or reasonably suspected by them, suggesting in any way that it was reasonable to act in an aggressive, violent, cruel, and humiliating fashion.

40. They were the situation was safe for them and for the Plaintiff, and they had no reason to suspect that any person was in any danger of harm, nor that any force was necessary to prevent the commission of a crime or to presence evidence associated with any crime. But despite this knowledge, they treated the situation as if it was one in which they were serving a special judicially-approved no-knock warrant on a residence in which they reasonably expected the occupants to be engaged in crime and further reasonably expected them to respond to service of the warrant with violence, or in which they could reasonably take the position that there was the potential for violence from the presence of persons or things unknown to them but which the circumstances would suggest warrant extreme caution.

41. When the deputies arrived, they were familiar with the residence and its occupants. They were familiar with the nature of the call and with the fact that it was unlikely to involve

criminal activity or pose any threat of physical harm. And upon arriving at the call and being welcomed into the home by the Plaintiff's husband, they were informed of the exact nature of the call and informed that the Plaintiff was not acting unlawfully and did not pose a threat of harm. And then, in addition to their general knowledge, which they carried with them to the call, and their specialized knowledge, which they were given by the Plaintiff's husband upon their arrival at the call, they had the opportunity to engage with the subject of the call, whom they observed naked and unarmed, with the absence of any contraband or weapon possibly being on her person or within her reach. And possessing all of this knowledge and faced with nothing more than a small, unarmed, unthreatening naked woman whose only offense was that she was suffering from an emotional trauma, three law enforcement officers joined together to place their hands on her, restrain her in shackled, and project such force as to cause her to come tumbling down the stairs of her own house.

42. What justified the use of such force? That she ignored their directives to come out of her bathtub, where she sat peacefully unclothed and where she had every right to be and remain? Nothing justified such force. The sheriff's office had received numerous calls of similar nature from the residence, the deputies were tired of coming out to the house, and they decided to use such force to punish an innocent woman for causing them to repeatedly come to the house and to deter her from causing them further annoyance.

43. The individual Defendants, as law enforcement officers, were acting under color of law as sworn agents of the state and local government.

44. By their actions, the Defendants individually and collectively engaged in assault and battery against the Plaintiff, acted with negligence and gross negligence proximately

causing physical and emotional harm to the Plaintiff, as well as present and future pain, suffering, fear, and humiliation, and violated the Plaintiff's rights under the Fifth and Fourteenth Amendments to the United States Constitution, which provide guarantees against illegal and excessive force as demonstrated by the Defendants during their violent seizure and battery of her.  The Defendants' actions also violated the Plaintiff's rights to procedural and substantive due process as guaranteed under the Fourteenth Amendment to the United States Constitution.

45. The assault and battery claims, as well as the claims for negligence and gross negligence, are redressable pursuant to common law and to the State Tort Claims Act, and all claims are redressable as federal claims pursuant to the provisions of 42 U.S.C. § 1983, as violations of the Plaintiff's federal civil and constitutional rights by state actors acting under color of law.

## **FIRST CAUSE OF ACTION**

### **(**ASSAULT AND BATTERY**)**

46. The allegations of all of the preceding paragraphs are re-alleged and incorporated herein by reference to the same extent as if set forth herein in full.

47. Upon information and belief, Defendants Killion and Mood physically and mentally assaulted and physically battered Plaintiff Bianca Best by unlawfully seizing her and removing her from her residence before dragging her into public naked in full view of her neighbors with a force that was entirely unjustified and in any event far beyond what might have been necessary to be employed by the Defendants under the circumstances.

48. As a direct and proximate result of the assault and battery inflicted upon the Plaintiff, the Plaintiff has suffered physical and emotional injuries, mental suffering and anguish, fear, anxiety, sleeplessness, and deep and lasting humiliation.

## SECOND CAUSE OF ACTION

### (NEGLIGENCE AND GROSS NEGLIGENCE)

49. The allegations of all of the preceding paragraphs are re-alleged and incorporated herein by reference to the same extent as if set forth herein in full.

50. Defendants Killion and Mood are employees and agents of the Dorchester County Sheriff's Office.

51. Defendant Sam Richardson, as sheriff of Dorchester County, is liable for the actions of his deputies and has a duty of care owed to the public, including a duty of care involving the hiring, training, and supervision of his deputies.

52. Defendants Killion and Mood, by engaging in the use of unjustified, unlawful, and excessive force, engaged in negligence and gross negligence resulting in the injuries suffered by Plaintiff Bianca Best.

53. Defendants Dorchester County Sheriff's Office and County of Dorchester have duties of reasonable care in hiring, training, and supervision of county deputies, and each breached those duties in this case, foreseeably resulting in harm to Plaintiff.

54. This claim is brought forth as a common law claim and a claim under the South Carolina Tort Claims Act.

## THIRD CAUSE OF ACTION

(Intentional Infliction of Emotional Distress)

55. The allegations of all of the preceding paragraphs are re-alleged and incorporated herein by reference to the same extent as if set forth herein in full.

56. Defendants Killion and Mood, by applying excessive force against the Plaintiff and by treating her in an illegal, inhumane, and humiliating manner, intentionally or recklessly subjected the Plaintiff to intolerable cruelty and harm, causing her to suffer extreme mental and emotional distress, anxiety, nightmares, lack of sleep, and chronic fear.

57. This claim is brought forth as a common law claim and a claim under the South Carolina Tort Claims Act.

## FOURTH CAUSE OF ACTION

(42 U.S.C. § 1983 et seq.)

58. The allegations of all of the preceding paragraphs are re-alleged and incorporated herein by reference to the same extent as if set forth herein in full.

59. 41. Defendants violated the rights of the Plaintiff under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United Sates Constitution, entitling Plaintiff to be compensated for her damages in excess of $75,000.00 and to be awarded punitive damages against the individual Defendants and recover her costs and attorney fees from each Defendant.

60. Defendants violated the Plaintiff's right to be free from an unlawful seizure and excessive use of force while acting under color of law, violating her rights under the Fourth, Fifth, Eighth, and Fourteenth Amendment rights under the United States Constitution. They also violated her Fourteenth Amendment right to substantive due process.

WHEREFORE, the Plaintiff prays for the following relief:

1.  A jury trial on all issues so triable;

2.  A judgment in favor of Plaintiff and against all Defendants on all causes of action;

3.  An award of compensatory damages in excess of $75,000.

4.  An award of punitive damages against the individual Defendants as allowed by law;

5.  An award of costs and reasonable attorney's fees.

6.  Any other and further relief that this court deems just and proper.

                              RESPECTFULLY BY:

                              s/Aaron V. Wallace
                              Aaron V. Wallace (11469)
                              Wallace Law Firm
                              1416 Laurel Street, STE B
                              Columbia, SC 29201
                              PH 803-766-3997

November 24, 2025                Fax:839-218-5786